UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

TERRY LYNNE WAGNER,

                 Petitioner,

v.                                                 Case No:  5:20-cv-65-TPB-PRL

SECRETARY, DEPARTMENT OF
CORRECTIONS and FLORIDA
ATTORNEY GENERAL,

                 Respondents.

_____/

## ORDER DENYING THE AMENDED PETITION AND DISMISSING CASE WITH PREJUDICE

### I.    Status

Petitioner, Terry Lynne Wagner, an inmate of the Florida penal system,
initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of
Habeas Corpus by a Person in State Custody (Doc. 1). Petitioner is challenging a
state court (Marion County, Florida) judgment of conviction for lewd and lascivious
molestation of a child. Petitioner is serving a twenty-five-year term of incarceration
to be followed by a life term of sex offender probation. Respondents filed a Response
(Doc. 10).[1] Petitioner filed a Reply (Doc. 14). This case is ripe for review.

---

[1] Attached to the Response are several exhibits. The Court cites the exhibits as "Resp. Ex."

II.     **Governing Legal Principles**

*A. Standard of Review Under AEDPA*

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. *See Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" *Id.* (quoting *Greene v. Fisher*, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. *See Marshall v. Sec'y Fla. Dep't of Corr.,* 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. *See Harrington v. Richter*, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"

or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." *Id.* § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* [at 102] (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 18 (2003); *Lockyer*, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

*Bishop v. Warden, GDCP*, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (citing *Wiggins v. Smith*, 539 U.S. 510,

521 (2003), and *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 687.

Further, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. *Richter*, 562 U.S. at 105. As such, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." *Id.* (citing *Richter*, 562 U.S. at 105); *see also Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1333-35 (11th Cir. 2013); *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III.    Analysis

#### *A. Ground One*

Petitioner argues that the trial court erred in denying his motion to suppress his post-arrest statements made during a police interview in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), (Doc. 1 at 5-9). According to Petitioner, the statements he made to Agent Jefferey Rohrer immediately following a polygraph examination exceeded the scope of his consent, and were made without the benefit of counsel when Agent Rohrer knew Petitioner was represented by counsel. Petitioner's also argues that his alleged waiver of counsel was not knowingly and intelligently made.

To provide context to Petitioner's claim, the Court discusses the procedural history as it relates to this issue. Before trial, Petitioner, through defense counsel, moved to suppress statements Petitioner made during a post-arrest polygraph test conducted by United States Secret Service Agent Rohrer in violation of his Fifth, Sixth, and Fourteenth Amendment rights (Resp. Ex. B). The trial court conducted a pretrial hearing on the motion to suppress (Resp. Ex. C). During the hearing, defense counsel argued that after Petitioner was arrested, he suggested that Petitioner undergo the polygraph test to help aid in dismissal of the case (*id.* at 7). According to counsel, however, contrary to their prior agreement, the state did not provide counsel with the polygraph questions before the interview, and Petitioner's low IQ made him vulnerable to continued questioning after the polygraph test. Counsel asserted that the polygraph exam was supposed to be limited to a few

specific questions about a single issue – did Petitioner touch B.L. with sexual intent (*id.* at 6-7). But, according to counsel, the state did not limit the questioning and improperly continued to question Petitioner after the polygraph test, ultimately coercing incriminating statements and a confession from Petitioner. Thus, counsel argued Petitioner's statements should be suppressed. The state argued that the parties did not agree that the exact questions would be provided to defense counsel before the polygraph test and Petitioner executed a written waiver before making the subject incriminating statements (*id.* at 8-10).

Agent Rohrer testified at the pretrial hearing that in March 2013, the Marion County Sheriff's Office contacted his department asking that he help conduct Petitioner's polygraph test (*id.* at 34-35). Agent Rohrer explained that during the polygraph test, only he and Petitioner were in the interview room while Marion County Detective Mongeluzzo observed the test from an adjacent observation room (*id.* at 36-37). According to Agent Rohrer, before the interview, he advised Petitioner of his rights and Petitioner executed two written forms, one acknowledging his rights and voluntarily waiving those rights, and another consenting to the examination (*id.* at 38-39). In executing the forms, Petitioner acknowledged that he had a right to request his attorney at any time, and that he could refuse to answer questions at any time (*id.* at 45).

Agent Rohrer testified that after the polygraph test, Petitioner voluntarily told Rohrer he touched the victim's vagina in a sexual manner because the victim was "sexually testing him" by doing jumping jacks in front of him, so he decided "to

sexually test her" (*id.* at 46-47). According to Rohrer, when Petitioner made that statement, Petitioner did not indicate that he was confused about his rights, nor did he appear mentally challenged (*id.* at 46-47). Agent Rohrer explained that Petitioner's statement was not in response to any question asked by Rohrer; instead, Petitioner voluntarily offered the information on his own (*id.* at 48). Rohrer testified that after this statement, Rohrer then left the room and spoke with Detective Mongeluzzo who advised that Petitioner could leave (*id.* at 48-49).

Petitioner testified at the motion hearing that after the polygraph test, Agent Rohrer told Petitioner he failed and then proceeded to ask Petitioner further questions (*id.* at 24). Petitioner stated that he then made the incriminating statements because he thought that's what the Agent wanted to hear (*id.*). According to Petitioner, he felt like he was not free to leave and was intimidated by Rohrer's questioning (*id.* at 25).

At the hearing, the trial court also considered testimony from Detective Mongeluzzo and defense expert Dr. Gary Honickman, as well as extensive argument from defense counsel and the state (*id.* at 13-18, 55-71, 72-92). The trial court subsequently denied Petitioner's request to suppress the statements, explaining:

> All right, then. I think I fully understand your argument, counselor, at this point.
>
> And this is a case that actually has an added fact in it that these other cases that have been cited did not have, other than the distinguishing facts of how the questions were elicited. I don't find that there was any deliberate eliciting by the State of incriminating statements. I don't find that. I don't find there was exploitation by the State in this case. I don't find that.

But the difference, factually, in the cases that were presented and the case at bar is that this defendant was, without question in the court's mind, from the expert witness, Dr. Honickman, and from the agent of the state, aware that he was limited in his IQ and intelligence. And I phrase it such, to be more specific, from the expert, mildly retarded. He fell in that IQ percentile or score, 61.

Now, the State did not know that specifically, but they were aware that he was an ESE student and had special classes. So that, in and of itself, gave knowledge to the State that he was of limited intelligence.

So then the question becomes whether he understood what he was doing there and furthermore, specifically, whether he understood his waivers and his consent that he did sign. He didn't recall signing them. He didn't say he didn't sign them. He didn't recall signing them. But there's evidence for the State that, in fact, he did sign them. That they were read to him and he was asked did he understand and he answered yes.

Well, that's a fact that I have to consider, coupled with the fact that the expert, Dr. Honickman, indicated that his responses, his answers, his actions in this polygraph process could be, he said, he didn't say they were, but could be affected, that is, he could be more sensitive, more easily intimidated, based on his personality testing and because of the limited IQ he had.

So how does that, then, affect whether or not his consent and waiver -- consent to the polygraph, he consented to that. That was pursuant to an agreement through his attorney, and his waiver of his right to have an attorney there and to answer questions was voluntary or not. Although he signed the document. Said he understood.

The question is to what extent did he understand. I don't have that clearly before me except that I know that it could be affected, it could have been affected because of his limited IQ, because of his -- it's not limited IQ, because of his IQ and the fact that he's mildly -- in the mildly

retarded range of IQ. That, really, in this court's mind, becomes a factor to be considered.

I do also find that the type of questions and more specifically, his statement provided during the polygraph testing was not one that would have required the attorney to be present, because it was not a crucial confrontation from what I've heard in the way that the polygraph went forward. So it wasn't required that you be there. In other words, he could voluntarily waive the right to have you present as his attorney.

And then it comes to the main question as to whether or not his statement was voluntary. In other words, was it in response to a question or was it voluntarily given regarding his actions and his act of touching the victim in the vaginal area over clothing as this charge relates. And I took a note on that issue and let me just find it, because -- and what I have here in my notes is -- well, let me just read a couple things I think are germane.

Is one, he initially denied that he intentionally molested the child. And he was told by the agent that he failed the test and asked if he was a rapist or a molester and he said, "none of the above." So he fully understood that and said "none of the above." He responded "none of the above."

And then just to get out of there -- this is the testimony of Mr. Wagner today -- just to get out of there, he told them what they wanted to hear is what he said, what they wanted to hear. He knew the questions he was going to be asked before they were asked. And then I find this germane -- the defendant admits that he touched the victim on her vagina in a sexual manner. [He said the] [v]ictim was . . . sexually test[ing] him by doing jumping jacks. Then he would test her. But when the victim told him he should not be touching her vagina, he pulled away and he stated that the victim should be in control of her body. Defendant made statement[s] gratuitously, not in response to a specific question. He did not appear retarded is what I wrote. I wrote "retarded." The words were he did not appear to seem confused. He did not seem

mentally challenged, is what I think the exact words were.

So having read those statements that I heard from the defendant on the witness stand and from the agent on the witness stand that testified today, the special agent whose name I don't remember at the moment but I have it written down here. Rohrer.

I find that the statements were voluntary. Now, that means I'm going to deny the motion to suppress. The question is still a question of fact as to whether it was accidental, whether it was intentional, whether when he made the gratuitous statement to the agent, he did so, even though gratuitously, because in fact he did intentionally touch her in a sexual way or that he just made that statement to get out of the -- to conclude it. He was ready to go. But he was not in custody at the time. I don't find that it falls under the crucial confrontation. He had gone there voluntarily and he understood to the extent that he understood everything, all of the statements he made; those that would benefit him and those that would not.

And so I cannot find that this statement should be suppressed.

(Resp. Ex. C at 92-97).

Petitioner proceeded to trial and a jury found him guilty of lewd or lascivious molestation (Resp. Ex. I). Petitioner, with help from appellate counsel, sought a direct appeal and argued that the trial court erred in denying Petitioner's pretrial motion to suppress the statement made to Agent Rohrer (Resp. Ex. M at 23). The state filed an answer brief arguing that the trial court properly denied the motion to suppress because neither the state nor Agent Rohrer elicited Petitioner's incriminating statements; Petitioner consulted his attorney before the interview and voluntarily went to the interview alone; and Petitioner was advised of his

*Miranda* rights and signed two written forms waiving his rights before the interview (Resp. Ex. N). The Fifth District Court of Appeal then denied Petitioner's claim and per curiam affirmed his judgment and sentence without a written opinion (Resp. Ex. P).

Initially, "[a]s a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence," because the state court "has wide discretion in determining whether to admit evidence at trial[.]" *Alderman v. Zant*, 22 F.3d 1541, 1555 (11th Cir. 1994); *see also Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir. 1985) (federal habeas corpus is not the proper vehicle to correct evidentiary rulings); *Boykins v. Wainwright*, 737 F.2d 1539, 1543 (11th Cir. 1984) (federal courts are not empowered to correct erroneous evidentiary rulings in state court unless rulings deny petitioner fundamental constitutional protections). Thus, Petitioner's underlying challenge to the state's court's determination on the admissibility of his statements to Agent Rohrer is not generally proper for this Court's consideration.

In any event, the Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Courts finds that the state court properly determined that Petitioner's statements to Agent Rohrer were voluntary. Before the polygraph test, Petitioner was given his *Miranda* warnings and executed a written waiver. After Agent Rohrer advised Petitioner he failed the polygraph test, Petitioner, unprovoked and without coercion, attempted to explain his actions, and in doing so, offered incriminatory

statements. Based on the totality of the circumstances, the Court finds that the state court's decision was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts considering the evidence presented in the state court proceedings. *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (In order to determine whether a confession was voluntarily given, there must be "an examination of the totality of the circumstances[.]"). Ground one is due to be denied.

### B. Ground Two

Petitioner argues that his trial counsel was ineffective for failing to file a motion to suppress the statements Petitioner made during his initial, pre-arrest police interrogation because police obtained the statements in violation of Petitioner's *Miranda* rights (Doc. 1 at 11).

Petitioner raised this claim in his Florida Rule of Criminal Procedure 3.850 motion (Resp. Ex. R at 4). The trial court ordered an evidentiary hearing and appointed postconviction counsel to represent Petitioner at the hearing (Resp. Ex. T). During the hearing, the trial court considered testimony from Petitioner, Deputy Michael Mongeluzzo, and Assistant State Attorney Jennifer Kipke (Resp. Ex. U).[2] The trial court later denied the claim:

> The defendant argues that he was "in-custody" for purposes of *Miranda*[] when he was interviewed by investigators without having been informed of the warnings required by *Miranda* for a custodial

---

[2] Petitioner's trial attorney, Mr. Lewis Dinkins, passed away after Petitioner's trial and before his postconviction proceedings (Resp. Ex. C at 4).

interrogation. He argues that Mr. Dinkins was ineffective because there was no motion to suppress the pre-arrest statements.

The State argues that the interview was non-custodial; therefore, no *Miranda* warnings were required.

The trial transcript reflects that the pre-arrest interview took place in a conference room at a local high school where the defendant was employed. There were two deputies present for the interview with the defendant. The interviewing deputy testified that he did not inform the defendant of the *Miranda* warnings because the defendant was not in custody and was free to leave at any time. The defendant was not under arrest, and was not arrested until the following day. The deputy testified that he was not confrontational during the interview, that neither deputy got up during the interview, and that the interview was not suggestive in any way.

The defendant's motion does not allege that either of the deputies threatened him in any fashion, that they detained him against his will, that they prevented him from leaving, or that they exercised any form of coercion on him. At the evidentiary hearing the defendant testified he was nervous and intimidated during the interview by the deputy because he suffers from being mildly mentally retarded, and it is his belief that this should have been the basis for a motion to suppress his statements. He did not establish such a motion would have been successful.

Deputy Mike Mongeluzzo is the officer who conducted the interview of the defendant. Deputy Mongeluzzo testified at the evidentiary hearing that he interviewed the defendant at Forest High School where the defendant worked. Detective Skinner was also present during the interview. He was not informed by the defendant or anyone else that the defendant had a low IQ, and was not aware of it at the time of the interview. He did not read *Miranda* warnings to the defendant because it was a non-custodial interview in a room at the school, the exit door was behind the defendant and was unlocked, the defendant was free to leave, he was not under arrest,

he was allowed to leave after the interview and he was not arrested that day.

The defendant has not established that a motion to suppress his statements would have been successful. Counsel cannot be ineffective for failing to file a motion which would have been properly denied. *Branch v. State*, 952 So.2d 970 (Fla. 2006).

. . . .

(Resp. Ex. V at 4-6) (record citations omitted). Petitioner appealed the trial court's denial, and the Fifth DCA per curiam affirmed the order without a written opinion (Resp. Ex. BB).

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court defers to the state court's finding that counsel was not deficient for failing to file a meritless motion to suppress. The record shows that Petitioner's first encounter and interview with police was not custodial in nature (Resp. Ex. C at 60-63). The interview occurred in a conference room at the school where Petitioner worked, the door was unlocked, and officers did not arrest Petitioner after the interview (*id.* at 57-58). According to Detective Mongeluzzo, Petitioner appeared to understand the nature of the interview, he never suggested he was confused about what he was saying or being asked, and the officers did not have a problem understanding Petitioner's answers (*id.* at 61). During the interview, Petitioner admitted to touching the victim but advised officers that the touching was accidental; however, Petitioner then changed his story and claimed he touched the victim because he "wanted a better relationship with her" (*id.* at 58-59). Officers did not arrest Petitioner until the next day (*id.* at 63). On this

record, any motion to suppress Petitioner's statements under *Miranda* would not have succeeded. Under the deferential standard of AEDPA review, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of *Strickland*, and it was not based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d). Ground Two is denied.

### C. Ground Three

Petitioner argues that his trial counsel was ineffective for advising Petitioner to participate in the polygraph examination with Agent Rohrer and then failing to accompany Petitioner to the test, allowing officers to coerce Petitioner, who is intellectually challenged, into making incriminating statements (Doc. 1 at 14-17).

Petitioner raised this issue in his Rule 3.850 motion (Resp. Ex. R at 13-18). Following an evidentiary hearing, the trial court denied this claim:

> The defendant alleges that he agreed to take a polygraph examination in connection with this case because Mr. Dinkins told him that if he took the examination he (Mr. Dinkins) could get the charge dropped. Mr. Dinkins later moved to suppress certain statements made by the defendant during the polygraph examination that was administered. This motion to suppress was denied and is not an issue in these proceedings.
>
> The State points out that the defendant agreed to a polygraph examination before he retained Mr. Dinkins to represent him.[3] The State also points out that when the defendant arrived for the polygraph examination he was told he was free to leave; he signed a waiver of rights and

---

[3] The record shows that during his first pre-arrest interview with police at Forest High School, Petitioner advised Detective Mogeluzzo that he would undergo a polygraph test (Resp. Ex. C at 63).

an agreement to answer questions without his lawyer present; and a consent to the polygraph examination. After the polygraph examination the defendant was told he failed the exam and subsequently confessed to the officer administering the examination. During his confession, the defendant volunteered information about the incident, including saying he was "sexually testing" the victim.

The State argues the polygraph examination was clearly a strategic decision on the part of the defense intended to support their theory of defense that there was no intentional touching by the defendant. The examination was intended to facilitate a dismissal of the charges, and it was agreed that the results of the examination would not be admissible at any trial.

The defendant argues that Mr. Dinkins was ineffective for allowing the polygraph examination to take place based upon his prior knowledge of the defendant's low IQ, and also that Mr. Dinkins was ineffective for not accompanying the defendant to the polygraph examination and being there for the defendant if he was needed. The defendant suggests that if Mr. Dinkins wanted a polygraph examination of the defendant, he should have given him one privately first to see what the result would be prior to suggesting that one be administered in conjunction with the State, the results of which would be made know[n] and could be a basis for negotiations with the State.

Jennifer Kipke, the prosecutor in the case, testified [at the evidentiary hearing] that she discussed with Mr. Dinkins the matter of the defendant taking a polygraph examination. Mr. Dinkins requested that the defendant take a polygraph examination fairly early in the case and she eventually agreed because the crux of her case was whether or not the defendant intentionally touched the victim in a sexual manner. Notwithstanding the fact that the results would not be admissible, she would have dropped the charge against the defendant if he had passed the polygraph examination.

"Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions." *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000). In addition, although post conviction counsel argued this to the court, the defendant failed to offer any evidence that no reasonable competent attorney would have made the same decision as Mr. Dinkins regarding the polygraph.

. . . .

The defendant argues that Mr. Dinkins determined the defendant was "presumptively incompetent" and was aware of the defendant's mental health history. The defendant argues that, based upon the assessment by Mr. Dinkins, and the results of a consultation with Dr. Gary Honickman about his current assessment of the defendant, Mr. Dinkins should have sought a competency determination before trial. He argues there was a reasonable probability that he would have been found incompetent to stand trial. The defendant offered no evidence of any evaluation finding him incompetent in support of this claim.

The State points out that evidence of the defendant's diminished mental capacity was introduced both at the hearing on the motion to suppress and at trial. Dr. Honickman testified at trial that the defendant was mildly retarded based upon his IQ scores. Dr. Honickman admitted that the defendant functioned "fairly well" and that the defendant was "able to think t[h]rough things . . . .["] The State also points out that low IQ alone is not sufficient to establish incompetence. *See Thompson v. State*, 88 So. 3d 312, 321 (Fla. 4th DCA 2012); *Fuse v. State*, 642 So. 2d 1142 (Fla. 4th DCA 1994); and *Padmore v. State*, 743 So. 2d 1203 (Fla 4th DCA 1999).

Missing from the defendant's presentation in this claim is any evidence that no reasonable or competent attorney would have made the same decision as Mr. Dinkins regarding the competency issue. Although the defendant presented this premise in argument form, the defendant did not establish that Mr. Dinkins' decision is one no other competent attorney would have made. The

defendant does not identify anyone in his motion or in his hearing testimony who either could have, or would have appeared to testify on the defendant's behalf, and he offered no one who could have, or would have offered any evidence in support of this claim. Even if it were concluded that Mr. Dinkins' representation fell below professional norms as alleged by the defendant, there has been no prejudice demonstrated. By failing to offer any evidence that the defendant was in fact not competent to proceed, the defendant has failed to demonstrate how he was prejudiced by the failure to have an evaluation to determine competency such "that confidence in the outcome is undermined." *Hurt v. State*, 18 So. 3d 975, 995 (Fla. 2009). *See, also, Keith v. State*, 46 So. 3d 85, 88 (Fla. 5th DCA 2010). This is especially important in light of the assessment of Dr. Honickman that the defendant functioned "fairly well" and was "able to think things through."

In *Chestnut v. State*, 538 So. 2d 820 (Fla. 1989), the Florida Supreme Court rejected the doctrine of diminished capacity and found that abnormal mental conditions that did not meet the definition of insanity were inadmissible to negate specific intent. The Court found that persons with mental deficiencies not meeting the definition of insanity could be held accountable for their crimes just as anyone else.

(Resp. Ex. V at 6-10) (record citations omitted). Petitioner appealed the trial court's denial, and the Fifth DCA per curiam affirmed the order without a written opinion (Resp. Ex. BB).

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court heeds the state court's determination that counsel did not act ineffectively regarding the polygraph examination. The record shows that Petitioner first mentioned taking a polygraph test during his pre-arrest interview with police, before being charged and

retaining counsel (Resp. Ex. C at 63). Once counsel was retained, counsel and the state agreed that if Petitioner passed the test, the state would drop the charge against Petitioner and acknowledged that any test results would be inadmissible if Petitioner went to trial. Thus, advising Petitioner to undergo the test was a strategic decision. As the trial court noted during the hearing on the motion to suppress the post-polygraph statements, the polygraph test itself was not confrontational and Petitioner knowingly waived his right to have his attorney present; thus counsel's absence was not per se deficient. Further, after the polygraph test Petitioner never asked for his attorney. Petitioner claims that had counsel been at the polygraph test, counsel would have prevented Petitioner from making incriminating statements after the exam; however, that argument is purely speculative. The record also refutes any claim that Petitioner's intellectual deficiency demanded the presence of counsel. Thus, under the deferential standard of AEDPA review, the state court's adjudication of this claim was neither contrary to nor an unreasonable application of *Strickland*, and it was not based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d). Ground Three is denied.

### D. New Claims in Reply Brief

Petitioner raises three grounds in his Petition, which the Court has addressed. In his Reply, however, Petitioner, for the first time appears to raise three new claims. *See generally* Doc 14. Specifically, for the first time, Petitioner argues (1) his trial counsel was ineffective for failing to seek a competency

determination before trial; (2) trial counsel was ineffective for failing to object to hearsay statements introduced at trial; and (3) the cumulative effect of trial counsel's errors amounted to a Sixth Amendment violation (*id.*). But arguments raised for the first time in a reply brief are not properly before a reviewing court. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (citations omitted). Thus, the Court declines to consider those improperly and newly raised claims.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1. The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED with prejudice**.

2. The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3.      If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[4]

**DONE AND ORDERED** at Tampa, Florida, this 28th day of February, 2023.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**

Jax-7

C:      Terry Lynne Wagner, #U52240
         Counsel of record

---

[4] The Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.